**CITIZENS FOR the SCENIC SEVERN RIVER BRIDGE, INC., et al.**
**Plaintiffs,**

**v.**

**Samuel SKINNER, et al. Defendants.**

**CITY OF ANNAPOLIS, et al. Plaintiffs,**

**v.**

**Samuel SKINNER, et al. Defendants.**

**Civ. Nos. JH–91–2607, JH–91–2695.**

United States District Court,
D. Maryland.

Dec. 4, 1991.

Thomas McCarthy, Jr., Annapolis, Md., for plaintiffs Citizens for the Scenic Severn River Bridge, Inc., Dorothy M. Ackler and James D. Vance (Civil No. JH–91–2607).

Bryson F. Popham, Richard T. Colaresi, and Colaresi & Popham, Chartered, Annapolis, Md., for plaintiffs City of Annapolis and Don Wolfrey (Civil No. JH–91–2695).

Beverly Sherman Nash, Esq., U.S. Dept. of Justice, Washington, D.C. for defendants Samuel K. Skinner and Thomas D. Larson; J. Joseph Curran, Jr., Atty. Gen. of Maryland, Lawrence P. Fletcher–Hill, Esq. and Douglas N. Silver, Asst. Attys. Gen. of Maryland, for defendants O. James Lighthizer, Hal Kassoff and Torrey Brown.

## MEMORANDUM OPINION

JOSEPH C. HOWARD, Senior District Judge.

In September, two cases seeking injunctions were filed to prevent the construction of a bridge across the Severn River in Anne Arundel County, Maryland. The cases were consolidated promptly, (Paper No. 4), and scheduled to permit the Defendants, Maryland and Federal officials, to prepare a joint motion for summary judgment. The motion has been filed and fully briefed. (Motion, Paper No. 13; Opposition, Paper No. 16; Reply, Paper No. 18). Also currently pending are the Plaintiffs' Applications for a Preliminary Injunction. (Paper Nos. 1 and 21). A hearing was held on the applications for preliminary injunction and motion for summary judgment on November 26, 1991, and the Court is now prepared to rule.

## I. BACKGROUND

It became apparent to the Maryland State Highway Administration ("SHA") in the early part of the 1980's that the existing bridge on Route 450 that crosses the Severn River would need to be replaced or extensively repaired. The existing bridge was built in 1924 and despite efforts to

keep it in operation, including emergency repairs in the late 1970's, it is very near the end of its life expectancy. (State Administrative Record ("SAR") at 10).

The existing bridge is a two-lane drawbridge connecting Ritchie Highway with Annapolis. It provides only twelve feet of vertical clearance for boat traffic when its draw mechanism is down. Along both sides of the bridge are sidewalks that accommodate pedestrian and bicycle traffic. Its southern terminus is on the campus of the Naval Academy and very near the most historic area of the City of Annapolis. Adjacent to its northern end is a state park, Jonas Green State Park, that is framed on two sides by Route 450 and the river. As a result of the proximity of the bridge to these historically important areas and because of the environmental sensitivity of any major construction on the shores of a river, this project has been the subject of considerable public concern.

The planning process initiated by the State in the early 1980's eventually resulted in a meeting between State and Naval Academy officials in November of 1982. (SAR at 10–12). In June of 1983, the first public hearing was held. The stated purpose of the hearing was to elicit public reaction to a range of possible solutions to the deteriorating condition of the bridge. (SAR at 31–56). At the hearing, strong sentiment was expressed in favor of a "high-level" [1] alternative despite the fact that the State had originally excluded this as an option. As a result of the public input, the "high-level" alternative was added to those being considered and the remaining low level options were narrowed to two. In October of 1983, the SHA presented conceptual plans for a cable-stayed high

bridge to a meeting of the Annapolis City Council. [2] (Federal Administrative Record ("FAR") at 15, 48). The plans were greeted favorably.

In the early spring of 1984, the SHA conducted meetings with local elected officials, historic preservation groups and community organizations. (SAR at 100–01, 116–17). At the first of these meetings a preference was expressed for a cable-stayed high bridge alternative. At the subsequent meeting, no clear preference emerged. On April 30, 1984, the Annapolis City Council endorsed a cable-stayed alternative by unanimously passing a resolution. (SAR at 121–23). On May 10, 1984, a motion was passed endorsing a conventional high-level fixed span alternative at the conclusion of a meeting that included participation by a number of local, elected officials and Governor Hughes. (FAR at 49).

A second public hearing was held May 23, 1984. (FAR, Appendix B). At this meeting, a variety of preferences were expressed. While the Defendants contend that a conventional high-level bridge received the most support, the transcripts indicate that the cable-stayed design was the preferred option. [3]

In October of 1983, the SHA requested that the Federal Highway Administration ("FHWA") grant this project an exclusion from the requirement that a full environmental impact statement be prepared. (SAR at 70). The SHA requested the exclusion be granted only upon the express condition that it conduct a full Section 4(f) study [4] pursuant to the Transportation Act of 1966 to determine the impact of the proposed project on important surrounding

---

1. All of the discussions of "high-level" bridges have focused on bridges with between 60 and 80 feet of clearance for boat traffic.

2. Cable-stayed bridges are suspended from a central tower from which cables are strung to provide the support for the roadway.

3. Diverse views were expressed by those who spoke. However, simply upon the number of speakers endorsing various alternatives, the most support for any one alternative was for a cable-stayed bridge with 80 feet of clearance.

This was followed by a conventional span with 80 feet of clearance and then by a conventional span with 60 feet of clearance. The total number of supporters for a conventional span with 60 feet of clearance or more did surpass the support expressed for a cable-stayed design. (For summary, see FAR at 49–50).

4. Such studies investigate the impact of a proposed project on a myriad of considerations. The details of this particular Section 4(f) study are discussed at length below.

areas. The FHWA approved the initial exclusion from the requirement to prepare an environmental impact statement and the plan for the Section 4(f) study on December 22, 1983. (SAR at 76). The Section 4(f) study was conducted and a draft report prepared for consideration by the FHWA. (FAR, Appendix A). Following extensive consultation and revision, the FHWA approved the Final Section 4(f) Statement on May 29, 1985. (FAR, Appendix C).

In 1991, the Final Section 4(f) Statement and the exclusion were once again reviewed. (FAR at 170–210) In the application provided for the FHWA's review, the State provided a detailed summary of the project and how it had evolved. Many of the correspondence demonstrating the approval of various State agencies were included in the presentation.

In 1987, at Governor Hughes' request, a design competition was created to select the final design of the bridge. (FAR, Appendix D at 2; SAR at 250). Prior to the beginning of the competition, concern was expressed by the Naval Academy that anything less than 75 feet of clearance would not guarantee access by some of their vessels. As a result, the height of the bridge was adjusted accordingly. (SAR at 253–54). The winner of the design competition was announced in March, 1990. (FAR at 100; SAR at 756–65). The results of the competition were placed on display in May, 1990. (FAR, Appendix D; SAR 627, 638–46). This was the first time the public had an opportunity to see the actual drawings of the proposal since the public meetings in 1983 and 1984. Since May, 1990, funding has been arranged and preliminary work has been done in anticipation of construction.

The hearing on the pending motions provided the Court an opportunity to investigate the basis upon which certain decisions were made. The Court asked counsel to explain, among other things, how certain conclusions found in the administrative record had been reached. The Court also

called one witness to provide an explanation for the conclusion, found in the administrative record, that this project would not significantly affect the Naval Academy or Historic Annapolis. Based upon a review of the record, the information learned at the hearing, and the arguments of counsel, the Court will enter summary judgment.

▪▪ The appropriate role of this Court in reviewing the decision to build the planned bridge under the National Environmental Policy Act of 1969, Section 4(f) of the Department of Transportation Act and the National Historic Preservation Act is to decide whether the determinations that were made by the Defendants were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). This finding should be based upon the information that is available in the administrative record. *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743, 105 S.Ct. 1598, 1606, 84 L.Ed.2d 643 (1985); *Alexandria v. FHWA,* 756 F.2d 1014, 1024 n. 6 (4th Cir.1985). While there are certain narrowly defined exceptions to this rule that permit considering evidence from outside the administrative record, for example evidence to explain the record and to determine whether all relevant factors were considered[5], the rule in this circuit is that the focus is on the administrative record. *Virginia Agr. Growers Ass'n v. Donovan,* 774 F.2d 89 (4th Cir.1985); *Webb v. Gorsuch,* 699 F.2d 157, 160 (4th Cir.1983); *Fayetteville Area Chamber of Commerce v. Volpe,* 515 F.2d 1021, 1028 (4th Cir.1975), *cert. denied,* 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 140 (1976). *See ASARCO, Inc. v. U.S. EPA,* 616 F.2d 1153, 1158–61 (9th Cir. 1980) (discussion of times when admission of evidence outside the administrative record is appropriate).

## II. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Fourth Circuit has said the following about summary judgment:

---

**5.** It is on this basis that the Court called Mr. Little, the SHPO, to explain his conclusions found in the administrative record.

Summary Judgment is proper only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts. *Morrison v, Nissan Motor Co.,* 601 F.2d 139, 141 (4th Cir.1979); *Stevens v. Howard D. Johnson Co.,* 181 F.2d 390, 394 (4th Cir.1950). The party seeking summary judgment carries the burden of showing that there is no genuine issue as to any material facts in the case. Fed.R.Civ.P. 56(c); *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979). When determining whether the movant has met its burden, the courts must assess the documentary materials submitted by the parties in the light most favorable to the nonmoving party. *Gill v. Rollins Protective Services Co.,* 773 F.2d 592, 595 (4th Cir.1985). *Pulliam Invest. Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987). On those issues where the Plaintiffs will have the burden of proof, it is their responsibility to confront the Defendants' motions with relevant evidence. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Specifically, the Fourth Circuit has described the function of courts in cases reviewing an administrative action on an "arbitrary and capricious" standard when a motion for summary judgment is filed:

> Under this standard a reviewing court must decide if the agency's decision " 'was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The Court is not empowered to substitute its judgment for that of the agency.' " The agency is obligated to examine the available evidence and to articulate a "rational connection" between the evidence and its exercise of discretion.

*Virginia Agr. Growers,* 774 F.2d at 93 (citations omitted). Provided there is no genuine issue of material fact concerning this evaluation, summary judgment is appropriate. This review of the administrative record is primarily a legal question which is readily resolved by summary judgment. *Bank of Commerce v. City National Bank of Laredo,* 484 F.2d 284, 288–89 (5th Cir.1973), *cert. denied,* 416 U.S. 905, 94 S.Ct. 1609, 40 L.Ed.2d 109 (1974); *Gilbert Equipment Co. v. Higgins,* 709 F.Supp. 1071, 1077 (S.D.Ala.1989), *aff'd,* 894 F.2d 412 (11th Cir.1990).

### A. Violation of the National Environmental Protection Act

The first count of the Citizens' complaint asserts a violation of the National Environmental Protection Act (NEPA) based upon the alleged inadequacy of the studies that were conducted. (Civil No. JH–91–2607, Paper No. 1). The fourth count of the City's complaint asserts a violation of NEPA due to the granting of the exclusion, the failure to conduct adequate tests and the failure to consider adequately the alternatives (Civil No. JH–91–2695, Paper No. 1). Once again, the Defendants are entitled to summary judgment on this issue provided their decisions are not arbitrary and capricious.

■ NEPA requires environmental impact statements ("EIS") to be prepared when a project is "major" and will affect significantly the quality of the human environment. 42 U.S.C. § 4332(2)(C). Pursuant to NEPA, regulations have been promulgated to direct the decision of whether certain projects are "major" and will affect significantly the quality of the human environment. These regulations identify types of projects that normally do not present potential environmental impacts of a degree sufficient to require an EIS. 40 C.F.R. §§ 1500.4(p), 1500.5(k), and 1508.4. Projects that fit into one of the pre-identified categories are labeled "categorical exclusions" or "CEs". If a project fits into one of the categories and does not otherwise present any extraordinary features, it is appropriately categorized as an exception. 40 C.F.R. § 1501.4(a). One such category is bridge replacements. 23 C.F.R. § 771.117(d)(3). This project was categorized as a bridge replacement. This categorization was not arbitrary and capricious.

The planned bridge will replace the existing two-lane bridge connecting Ritchie Highway and Annapolis with another two-lane bridge connecting those two points. While the new bridge will remove the traffic control element of the drawspan and provide a wider road surface, these changes are not significant enough to render the proposed bridge distinct from the existing bridge. The Fifth Circuit, in *Sierra Club v. Hassell*, 636 F.2d 1095 (5th Cir.1981), faced a similar issue and determined that the granting of a categorical exclusion for a project that replaced a two-lane bridge with a drawspan with a high two-lane bridge without a drawspan was not arbitrary and capricious. The Court concluded that "it appears that the new bridge does not significantly alter the status quo." *Id.* at 1099. This reasoning sheds considerable light on the present dispute.

Further, the administrative record and the explanations in the pleadings and at the hearing provide thoughtful support for the conclusion that the proposed bridge is a *replacement* project. The new bridge will introduce no new destinations or points of origin. Nor will it increase the number of lanes. While it will doubtlessly be more convenient than the existing bridge, that distinction, at least for this consideration, creates no substantial difference.

The Plaintiffs contend that the proposed bridge will be built at a different site, will be longer, will not have the drawspan, and may include up to four lanes of traffic and the light rail trains.[6] (Paper No. 16 at 19). Conceding all these things to be true, however, does not make this bridge, as proposed, anything more than a replacement bridge. The differences have basically emerged from well-documented reasons addressed in the administrative record that will be discussed in turn.

For the categorical exclusion to be properly granted, there must also have been a finding that the proposed bridge involves no extraordinary features. The Plaintiffs, in addition to citing the concerns just addressed, point to a statement made by Victor Janata, the SHA project manager, during the June 23, 1983, Alternates Public Meeting to support the position that this bridge will have a serious and extraordinary impact. (Paper No. 16 at 18). At that meeting, Mr. Janata indicated that the SHA had "chosen not to pursue a high-level fixed span alternate due to severe on-shore impacts." (SAR at 37). Nevertheless, when questioned about this statement at the hearing, defense counsel explained that between the time the statement was made and the initial approval of the categorical exclusion, studies were conducted and alternatives identified to avoid those impacts. Specifically, the current planned point of departure from the ground was selected for this very concern. With this explanation in mind, it was not arbitrary and capricious for the Defendants to grant the categorical exclusion despite Mr. Janata's statement in June of 1983.

The final consideration is whether the process employed in relation to the categorical exclusion provided for ongoing review and monitoring. The exclusion was originally granted with the express condition that a Section 4(f) statement be prepared. That statement was prepared and supported the initial projections of little or no impact. Additionally, as the shape of the project was finalized, the entire exclusion underwent an extensive review. Once again, the CE was approved. This process required reasoned conclusions and defenses for the selected design at many stages. For these reasons, the Court finds that the categorical exclusion was not arbitrary and capricious.[7]

6. That the proposed bridge will carry light rail trains and four lanes of traffic is speculation. The Court has considered the bridge as proposed, not as it may become in the future. The decision to add lanes of traffic and light rail will be made at a different time and presumably require another set of hearings.

7. The Plaintiffs also contend that the Defendants failed to consider a mid-level alternative. (Paper No. 16 at 22–23). No such alternative was raised at the Alternates Meeting nor considered by the designers. The Plaintiffs contend that this was a violation of NEPA. The administrative record reveals that many alternatives to the selected design were systematically consid-

## B. *Violation of Section 4(f) of the Transportation Act*

Count II of the Citizens' complaint and Count V of the City's complaint assert that Section 4(f) of the Transportation Act of 1966 ("Section 4(f)") will be violated by the planned construction. Section 4(f) prohibits the construction of projects that will affect negatively certain protected areas when less intrusive alternatives are possible. The Plaintiffs contend that no fewer than nine violations of the Act are found in this case. (Paper No. 16 at 28–42).

The Plaintiffs maintain that the Defendants have failed to consider how certain properties will be "used" by this project. To the contrary, each of the identified properties has been considered at some step of the process. Whether the consideration has been adequate, however, is a different question. Once again, provided the Defendants' actions were not arbitrary and capricious, summary judgment should be entered in their favor.

■ The Plaintiffs argue, for example, that "[t]he Defendants have wholly failed to identify or consider the use of Jonas Green Park (the park) by the proposed bridge project." (Paper No. 16 at 30). While the park was not identified as a Section 4(f) property, it was certainly considered in the Final Section 4(f) Statement. The discussion of the selected alternate includes an indication that "[t]he selected alternate will completely avoid Jonas Green Park. Traffic will be moved further away from the park since the alignment is shifted to the south." (FAR, Appendix C at 6). Subsequently, in the same report, there is a discussion of the park in the section on avoidance alternates. In the sub-section in which an upstream crossing is discussed, there is a notation that such an option was studied and not selected because of the impact it would have on the park. The Final Section 4(f) Statement observes:

> "[The upstream crossing alternative] would require substantial property from the Jonas Green Park/Picnic Area. The

park consists of approximately five (5) acres and is heavily used in the summer months as a recreational area. An alternate paralleling the existing bridge on the upstream side would require slightly more than two (2) acres. Included in this acreage would be an area used for picnic tables and a portion of the parking area."

(FAR, Appendix C at 7–8).

The integration of the existing bridge into the park as a fishing pier also reflects the consideration that was given to the park during this project. (FAR, Appendix C at 11; SAR at 266–70, 312–13, and 317–18). The changes to the park are considered improvements by the Maryland Department of Natural Resources and are predicted to generate a higher level of use. (SAR at 266–70).

■ The concern expressed by the Plaintiffs is that the proposed new entrance into the park will "erect a wall on the southern side, severely hamper[ing] the park's ambience." (Paper No. 16 at 31). This is explained by the assertion that the view from the park will be diminished and that "[t]he juxtaposition of the high bridge and approach roads will dramatically diminish the utility and attraction of the park." (*Id.* at 38). The Defendants simply disagree with the Plaintiffs over these aesthetic preferences. So long as serious consideration of the appropriate factors is reflected in the record, this Court is empowered only to accept the agency's determinations. *Coalition on Sensible Transportation v. Dole,* 826 F.2d 60, 64 (D.C.Cir.1987) (citing *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823). The Court finds that such consideration has been given to Jonas Green State Park.

■ The Plaintiffs next contend that the Scenic Overlook will be constructively used by the proposed bridge and that views from the site will be impaired. Regardless of whether the Scenic Overlook is a park land under Section 4(f), and therefore entitled to 4(f) protection, the effect of the proposed bridge on the Overlook was con-

---

ered. In fact, each alternative proposed by the public was considered carefully. It cannot be said that a failure by the Defendants to consider

one particular design, a design not suggested at any of the public hearings, made the selection of the chosen bridge arbitrary and capricious.

sidered and found to be, at most, minimal. A pictorial representation of the visual impact of the proposed bridge on the Overlook was prepared as early as the public hearing of May 23, 1984. (FAR, Appendix B at 73). This representation reveals that the proposed bridge, just as the old bridge, would be visible from the Overlook. Consideration of the Overlook is also found in the Final Section 4(f) Statement. (FAR, Appendix C at 10). Whether the new bridge will destroy the view from the Overlook is, once again, a matter of aesthetic preference. Resolving such disputes is not the role of this Court.

■ The Plaintiffs next argue that no consideration was given to the Pendennis Shrub Swamp. The Defendants claim that the Plaintiffs have failed to prove that this swamp is publicly owned and therefore deserving of Section 4(f) protection. During the course of the hearing conducted by the Court, this argument was specifically raised by the Defendants and not answered by the Plaintiffs. Nevertheless, even assuming this swamp is subject to Section 4(f) protection, the wetlands issues raised by this project have been studied extensively. There is an indication in the administrative record from 1984 that the project was not expected to affect the wetlands in the area. (FAR, Appendix C at C–52). This conclusion was made in response to a concern expressed by Ms. Elizabeth McWethy of the Weems Creek Conservatory.

Then, in 1990, a complete wetlands identification report was prepared by the SHA. (SAR at 265). A copy of the report was sent to the Army Corps of Engineers for their approval as part of obtaining a 404 permit. (SAR at 271–97). The study includes an extensive identification of the wetlands in the area, the expected impacts and mitigation plans. On December 3, 1990, a field delineation was conducted on the site with sixteen (16) people, including State and Federal officials. Minutes from this review are included in the record and · have been considered by this Court. Based upon the administrative record and the extensive studies on wetlands issues that

have been performed, the conclusion that this project will not threaten surrounding wetlands, including the Pendennis Shrub Swamp, is not arbitrary and capricious.

■ The Plaintiffs argue that the use of the Severn River was not adequately considered in the Final Section 4(f) Statement. Even assuming the Severn River is a Section 4(f) property, the driving consideration behind the high bridge alternative was to accommodate marine traffic. The uses of the river identified by the Plaintiffs are placement of the piers and pilings in the river, possible runoff, and removal of the existing bridge. These effects of the project, contrary to the Plaintiffs' assertions, have been considered. Specifically, for example, the Defendants considered a "no build" alternative that would have left the river as it currently is. (FAR, Appendix C at 7). Further, any of the proposed alternatives would have, to one extent or another, "used" the river as "use" is defined by the Plaintiffs. The way the Defendants considered the river in the planning of the bridge and in the Final Section 4(f) Statement was not arbitrary and capricious.

■ The Plaintiffs also assert that the Defendants failed to "identify or evaluate the constructive use of the Naval Academy by the proposed bridge." (Paper No. 16 at 38). Extensive discussion of this issue is found throughout the Final Section 4(f) Statement. This includes the actual use of the land on the grounds of the Academy, (FAR, Appendix C at 4), and the visual impacts. (*Id.* at 10). The view from the Naval Academy was considered in the ultimate selection of the design. (FAR, Appendix D at 6). The Naval Academy was involved in the planning of this project from its earliest stages and was active throughout the entire eight-year process. The design of the bridge was altered to accommodate its needs. The arguments raised by the Plaintiffs merely reflect a disagreement with the conclusions reached by the Defendants—conclusions that are not arbitrary or capricious.

Next, the Plaintiffs maintain that the Final Section 4(f) Statement failed to consider the view of the bridge from Annapolis

or the traffic impact caused by the proposed bridge. Both were considered in the Final Section 4(f) Statement. (FAR, Appendix C at 4–6). The specific impacts on Historic Annapolis will be discussed in more detail below; suffice it to say at this point that the Plaintiffs' claims relating to the impact on Annapolis are based simply on a disagreement with the reasoned conclusions of the Defendants.

 The Plaintiffs also argue that the Final Section 4(f) Statement was premature because the Statement was prepared in the early stages of the project. (Paper No. 16 at 41). By the time the Statement was prepared, a commitment had been made to a high level alternative to be built immediately downstream from the existing bridge. (FAR, Appendix C at 2–3). Further, the proposal called for ongoing follow-up and coordination. As previously explained, each of the areas the Plaintiffs argue were not adequately considered were, in fact, so considered. The considerations pre-dated the Final Section 4(f) Statement and continued to be updated and reviewed throughout the process.

The Plaintiffs' reliance on *D.C. Federation of Civic Associations v. Volpe*, 459 F.2d 1231 (D.C.Cir.), *cert. denied*, 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972), is misplaced. That case involved "the complete non-existence of any contemporaneous administrative record." *Id.* at 1237. Further, while there is language in the opinion regarding the approval of the subject bridge prior to finalized plans, it is found within the context of a complete lack of study, coordination, or follow-up. As the court explained:

> The Secretary has not yet determined which acres (of the affected park) will be taken. In addition, a project which respects a park's territorial integrity may still, by means of noise, air pollution and general unsightliness, dissipate its aesthetic value, crush its wildlife, defoliate its vegetation, and "take" it in every practical sense.

Absent a finalized plan for the bridge, it is hard to see how the Department could make a meaningful evaluation of "harm". Furthermore, Secretary Volpe did not consult with other planning agencies to coordinate efforts to minimize harm to the park and historic sites. He also made no studies of the potential air pollution damage to the park.

*Id.* at 1239. In this case, the concerns outlined by the court in *D.C. Federation of Civic Associations* were addressed as part of the administrative review process prior to the approval of the Section 4(f) Statement and subsequently reconsidered. As a result, the findings of the Defendants were not arbitrary and capricious because of a premature decision.

 Plaintiffs next challenge the basis of the determination found in the Final Section 4(f) Statement that there is no prudent or feasible alternative to the bridge selected. This challenge is rooted in the position that park land may not be destroyed unless "alternative routes present unique problems." (Paper No. 16 at 42, relying on *D.C. Federation of Civic Associations v. Volpe*, 459 F.2d at 1237). First, the Plaintiffs have not demonstrated that park land will be destroyed. Secondly, the administrative record, including the Final Section 4(f) Statement, reflects consideration of a low-level drawbridge alternative. That alternative was rejected for a series of sound reasons, including public preference for a high level bridge and the costs associated with operation and maintenance of a draw bridge. (FAR, Appendix C at 6–7). While the mid-level option now advocated by the Plaintiffs was not considered, the Court has already determined that a failure to consider that alternative was not arbitrary and capricious.

 The Plaintiffs also challenge the conclusion of the economic analysis that was done regarding a low-level alternative. Disagreements with the reasoned conclusions reached by the Defendants' experts are not relevant in deciding whether the decisions based upon those opinions were arbitrary and capricious. *Webb v. Gorsuch*, 699 at 160; *Fayetteville Area Chamber of Commerce v. Volpe*, 515 F.2d at 1028. As the Supreme Court has explained: "When specialists express conflict-

ing views, an agency must have discretion to rely on the reasonable opinions of its qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989). The Defendants reasonably relied upon their experts whose studies are found in the administrative record in concluding that it would be much more expensive to build and maintain a low level bridge. (FAR, Appendix C at 6–7). It is not for this Court to substitute its judgment for that of the experts who conducted the study or the Defendants who relied upon it. The Court has reviewed those studies, however, and finds neither the methodology employed nor the conclusions reached were arbitrary and capricious.

The Plaintiffs also contend that the rejection of the build-in-space alternative was premised on faulty information because two lanes have been added to the Route 50 bridge. This was not considered when the alternative was rejected, in part, because the volume of cars that would be forced to detour over the Route 50 bridge. The Plaintiffs do not contend that there was any error in the projection of traffic displaced over the Route 50 bridge in the event an alternate was selected that required closing of the existing bridge. Further, the Plaintiffs do not argue that the other reasons that caused this alternative to be rejected were untrue. The Final Section 4(f) Statement includes, as a justification for rejecting this alternative, the simple inconvenience caused by a six-mile detour for 18–24 months. (FAR, Appendix C at 8). This alone is sufficient to make the rejection of this alternative not arbitrary and capricious.

In short, each of the concerns raised by the Plaintiffs were either explicitly or implicitly studied by the Defendants as part of the Section 4(f) process. The role of the Court is not to referee disagreements between disgruntled parties and the Government; rather, the role of the Court is to assure adherence to the laws established to assure fairness and produce reasoned re-

sults. The process employed in the design of the subject bridge adhered to the requirements imposed by Section 4(f).

## C. *Violation of the National Historic Preservation Act*

The National Historic Preservation Act of 1966 ("NHPA"), 16 U.S.C. 470f, was passed with the purpose of protecting the historic legacy of our nation. 16 U.S.C. § 470(b). This is done by establishing procedural safeguards that require the FHWA to consider the effect of a proposed project on protected property and allowing the Advisory Council on Historic Preservation ("ACHP") an opportunity to comment. *D.C. Federation of Civil Associations v. Adams,* 571 F.2d 1310, 1313 (4th Cir.1978). So long as the effect on the properties is considered and the recommendations of the ACHP integrated into the decision making process, the regulations are satisfied. 36 C.F.R. 60.2(c). *See also Baltimore Gas & Electric Co. v. NRDC, Inc.,* 462 U.S. 87, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). Once again, this Court must overturn the Defendants' conclusions if they are arbitrary and capricious. *Hickory Neighborhood Defense League v. Skinner,* 893 F.2d 58 (4th Cir.1990); *Coalition for Responsible Regional Development v. Coleman,* 555 F.2d 398 (4th Cir.1977).

The Plaintiffs first argue that the Defendants have failed to consider the effect of the proposed bridge on the old bridge which is currently being reviewed for inclusion as a protected property. The argument is that because the existing bridge is being considered for inclusion, a material factual issue exists sufficient to prevent the entry of summary judgment in favor of the Defendants. (Paper No. 16 at 46). While this argument may have some appeal, it is undeniable that the old bridge is not now, nor has it been at any time during the planning process, recognized as protected under the NHPA. As a result, the Defendants were under no duty imposed by the NHPA to consider the bridge as historically protected. Nonetheless, the Defendants sought a review of the State's Historic Preservation Officer ("SHPO") re-

garding the eligibility of the bridge for such protection. He concluded that the bridge was not eligible.

■ Even assuming that the bridge was protected, however, it has been afforded every consideration. As has been recounted, that alternative of saving the existing bridge was rejected based upon a reasoned decision. The FHPA does not prohibit the replacement or even destruction of any protected property, only that their historical importance be considered. In this case the historical significance of the bridge was considered. (FAR at 64; FAR Appendix C at C–70). The regulations specifically anticipate this possibility and, if it occurs, call for the agency official to document his or her conclusion that the bridge is not protected and move forward. 36 C.F.R. §§ 800(c)(3); 800.4(d). ACHP is then to be notified and provided an opportunity to comment. 36 C.F.R. § 800.5(d). This is precisely the course followed by the Defendants.

■ The Plaintiffs argue that there was no adequate consideration of potentially significant archeological sites that may be impacted by the proposed project. (Paper No. 16 at 47–48). Two independent studies were conducted regarding this issue. Both concluded that no significant sites would be affected. (FAR at 61; SAR at 154, 190, 208). As a result, the SHPO concluded that no additional research on this issue was needed. (FAR at 65). The description of the events proffered by the Plaintiffs, (Paper No. 16 at 47), is unsupported in the administrative record. There is no reason that a conclusion grounded upon two independent studies is arbitrary and capricious.

■ The Plaintiffs urge the Court to find that the Defendants failed to consider adequately Historic Annapolis and the Naval Academy. The provisos of the NHPA were fully adhered to when the Defendants considered the effect the project would have on those two areas and invited comment from the ACHP.[8]

The administrative record is replete with evidence of the consideration given to Annapolis and the Naval Academy. Beginning in October 1983, the SHA sought the views of the SHPO regarding the impact of the proposed alternatives. (FAR at 10, SAR at 69). The SHPO conducted a review of the impact of the project keeping informed by the SHA as the high bridge alternative emerged as the selected option. (FAR at 18, 19, 56, 59; SAR at 77, 78, 80, 81, 102, 173). Testimony at the hearing held by the Court in this case revealed that this fourteen (14) month review included on site inspections of the area by members of the SHPO's staff and an independent consideration of how the project would affect traffic. Based upon this extensive review, the SHPO concluded that the proposal would have no adverse impact on Historic Annapolis or the Naval Academy provided continued input by his office was considered. (FAR at 64).

These determinations were reviewed by the ACHP in 1985. (FAR at 71–72). The SHPO's evaluation was confirmed by the ACHP, provided that the SHPO be consulted on design issues. (FAR at 73–74). In response to this condition, the SHPO served as one of the jurors in the design competition that selected the ultimate design. (FAR, Appendix D at 3).

Consequently, while the Plaintiffs maintain that the bridge will have a devastating effect on the Naval Academy and on Annapolis, the governmental officers charged with protecting these resources disagree. It was not arbitrary or capricious for the Defendants to rely upon the learned opinions of these experts. The NHPA certainly requires no more than was done.

### D. Safety Considerations for Pedestrians and Bicyclists

■ The Plaintiffs argue that the Defendants have failed to consider the safety

---

**8.** The Court is not unmoved by the Plaintiffs' concerns. Annapolis and the Naval Academy are two areas that clearly deserve the protection afforded by their status. Both possess a charm and ambience only found in communities of historical significance. In the case of these areas, there is a synergism of age and events that magnifies the attraction.

of pedestrians and bicyclists as required by 23 C.F.R. § 652.5. The administrative record demonstrates that these concerns were taken into account. Specifically, the shoulders were widened to accommodate bicycles and special care has been taken in the design of the road to make it safe for narrow bicycle tires. (FAR at 181). This change caused A. James Vouzikas, Assistant to the Director, Recreation of Parks, to comment in 1984: "I have written in the past, and have been very pleased to note, that the Department of Transportation has provided bicycle paths on the soon to be constructed 450 access to the City of Annapolis over the Severn River." (FAR, Appendix C at C–60). Further, the proposed bridge will have sidewalks on both sides for pedestrians. The wind will be blocked by solid parapets. (Paper No. 13 at 57). These features demonstrate that considerable attention and responsiveness was provided to assure the safety of bicyclists and pedestrians.

■ Even had this not been the case, the Plaintiffs could not prevail on this issue. There is no private cause of action afforded by 23 C.F.R. § 652.5. Rather, it serves only as a broad policy statement. As a result, the Plaintiffs may not assert a claim based on the regulation.

### E. *Coastal Zone Management Act and Maryland Critical Area Law*

The Coastal Zone Management Act ("CZMA") is designed to assure that states develop plans to protect their coastal zones. *Secretary of the Interior v. California,* 464 U.S. 312, 316, 104 S.Ct. 656, 658, 78 L.Ed.2d 496 (1984); *Shanty Town Assoc. Ltd. Partnership v. Environmental Protection Agency,* 843 F.2d 782, 793 (4th Cir. 1988). Mindful of encroaching into the states' domain, "[c]ongress intended ultimate responsibility for the regulation of land use to remain with the states." *Id.* at 793. All that is therefore required of a federal agency taking action that may affect a coastal zone is to perform that action "in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State man-

agement programs." 16 U.S.C. § 1456(c)(1)(A).

The Maryland plan is administered by the Maryland Department of Natural Resources ("DNR"). The DNR has reviewed this project and provided its approval. (SAR at 389). The Plaintiffs argue that this approval was provided in a manner that was inconsistent with State law because the project was not reviewed by the Chesapeake Bay Critical Areas Commission. In fact, contrary to this assertion, the Chesapeake Bay Critical Area Commission was consulted. It determined that a review was not required and, despite this conclusion, provided comments based upon the extensive information provided by the Defendants. (SAR at 361).

■ Finally, as will be discussed more extensively below, it would be inappropriate in this case for the Court to interpret State law in a case against a State actor. This dispute would require the Court to decide whether the State's coastal zone protection plan was followed by the SHA and the DNR.

For these reasons, the Court rules that the Defendants are entitled to judgment on this issue.

### F. *Public Hearing Requirements*

The Plaintiffs maintain that the public hearing requirements of 23 C.F.R. 771.111(h)(2) were not satisfied in this case. That regulation requires an opportunity for the public to be involved throughout the project to assist in the NEPA evaluations and to identify the social and environmental impacts. The Plaintiffs argue that the two public hearings held, the last of which was in 1984, failed to satisfy this requirement because the project changed dramatically between the last public hearing and the current proposal. They also contend that the information provided the public at the hearings was part of a "deceptive and secretive" campaign designed to assure that the bridge would be built. (Paper No. 16 at 57).

■ The administrative record fails to support the Plaintiffs' characterization of

this project as one mired in secrecy with little regard for public concerns. In direct response to public outcry, the Defendants shifted their focus from low level alternatives to a high bridge. The two very highly publicized hearings supplemented many meetings that included members of the general public and elected representatives. While those private meetings alone do not satisfy the regulation, in the context of this entire process, they help to demonstrate the level of input that was sought, considered and acted upon by the Defendants.

▮▮▮ Throughout 1983 and 1984 the record reflects strong support for the high level alternative. The commitment to move forward with some variation of the high bridge came in 1985, shortly after the last public hearing. (FAR at 52). This selection is found in the Final Section 4(f) Statement prepared on January 8, 1985. (FAR, Appendix C at 2). While it does indicate that the bridge would provide sixty-five (65) feet of vertical clearance from the water, it makes clear that final approval of the height would need to come from the Coast Guard. (*Id.* at 3).

All of the discussions of high level bridges had focused on clearances of between sixty (60) and eighty (80) feet. Alternates discussed at the public hearing in 1984 included one of "either 70 or 80" feet of clearance. (FAR, Appendix B at 6). Because the height of the proposed bridge remains within the parameters that had been discussed throughout the entire project, the increase from sixty-five (65) to seventy-five (75) feet of clearance did not trigger the need for additional public hearings. The purpose of the hearings is to provide the public with an opportunity to express concerns regarding proposed options. The concerns that any person may have had regarding a high-level fixed span bridge with vertical clearance of seventy-five (75) feet should have been expressed at the 1984 hearing. The conclusion that the change was not significant enough to alter the effects of the bridge finds support in

the 1991 review and approvals that occurred. It was not unreasonable for the Defendants, based upon these two factors, to move forward without additional hearings.

## G. *State Law Claims*

▮▮▮ The Plaintiffs assert claims under the Maryland Environmental Policy Act, Md.Ann.Code Nat.Res. Art. §§ 1–301 to 305, the Maryland Scenic and Wild Rivers Act, Md.Ann.Code Nat.Res. Art. § 8–405, and the Chesapeake Bay Critical Areas regulation. While it is not entirely clear, it appears that these claims are intended to be asserted only against the State Defendants.[9] There are few more clearly articulated and consistently applied maxims in constitutional law than those related to federalism. Of these, the Supreme Court's message in *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 106, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984), is among the clearest:

> A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.

Since *Pennhurst,* the Fourth Circuit has repeatedly affirmed trial courts that dismissed pendent state law claims against state officials. *See e.g. Huang v. Board of Governors of Univ. of North Carolina,* 902 F.2d 1134, 1138 (4th Cir.1990). Accordingly, this Court is not empowered to adjudicate the state law claims raised by the Plaintiffs. Further, as the Court has concluded that the Defendants are entitled to summary judgment on the federal claims, it declines jurisdiction over the remaining state claims. *See United Mine Workers v.*

---

**9.** In the Plaintiffs' opposition to the motion for summary judgment they argue that "[h]ere, the actions are being taken by the Maryland Depart-

ment of Transportation through its State Highway Administration." (Paper No. 16 at 64).

*Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

Accordingly, as there are no genuine issues of material fact, the Court will enter summary judgment in favor of the Defendants.

### III. LACHES AND ESTOPPEL

The Defendants argue that the Plaintiffs' cases should be barred by the equitable principles of estoppel and laches. Specifically, the Defendants maintain that the City of Annapolis should be barred by estoppel and the other Plaintiffs should be barred by laches. Both are broad, equitable remedies that afford a trial court broad discretion.

■ The Defendants argue that the City's active support of the project for years, support that was relied upon in selecting the current design, should prevent it from now challenging the proposal. The City counters by arguing that it supported a cable-stayed design not a fixed span.[10] However, each of the complaints that it now raises would have been implicated by such a design. In fact, a cable-stayed bridge would have been much taller as the suspension tower would have been far above the surface of the road. The support from the City through the resolution it passed, and less formal channels, came at a crucial time to assist in maintaining the CE and in approval of the Final Section 4(f) Statement. For example, the Final Section 4(f) Statement includes a specific reference to a meeting attended by City officials where a motion was passed supporting a conventional high level bridge. (FAR, Appendix C at 14). Whether the Annapolis official voted for this particular motion is immaterial. Rather, what is important is that the Defendants relied upon the support of the City in moving forward on a high level bridge.

The Defendants have been prejudiced by the City's actions. The reviews that the City now claims should have been done would have been much easier to accomplish when the process was still in the developmental stages. Also, as time has passed, the existing bridge has continued to deteriorate which compounds the problems associated by delay.[11] Based upon these considerations, the Court concludes that the Defendants detrimentally relied upon the support of the City and the City should therefore be estopped from bringing this action at this late date.

■ Laches should bar the Plaintiffs' claims if they failed to be diligent and if the Defendants were prejudiced as a result of the lack of diligence. *Costello v. United States*, 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961); *Giddens v. Isbrandtsen Co.*, 355 F.2d 125, 128 (4th Cir. 1966). If there has been any lack of diligence, the Court must balance that with the prejudice caused the Defendants. *Id.* at 128.

■ A lack of diligence is found "where 'the plaintiff delayed inexcusably or unreasonably in filing suit.'" *White v. Daniel*, 909 F.2d 99, 102 (4th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991) (relying on *National Wildlife Federation v. Burford*, 835 F.2d 305, 318 (D.C.Cir.1987)). Such a delay is only possible after the discovery of the facts giving rise to the litigation. *Ward v. Ackroyd*, 344 F.Supp. 1202, 1212 (D.Md. 1972). All of the Plaintiffs had notice of the planned construction as early as 1985 when the Final Section 4(f) Statement was approved. They were all intimately familiar, by their own accounts, with the process as it unfolded. While the Citizens for the Scenic Severn River may be a new entity, its complaint asserts that its "members are persons who reside proximate to or near the Bridge." (Civil No. JH–91–2607, Paper

---

**10.** An Annapolis City Alderman, Mr. Hammond, testified at the hearing held by the Court to provide an explanation for the City's action. Mr. Hammond was present at the Council meeting that passed a measure unanimously endorsing a cable-stayed high bridge.

**11.** Defense counsel informed the Court at the hearing that the existing bridge is only rated a four (4) of possible one-hundred (100) in terms of structural stability. While counsel assured the Court the existing bridge is safe, that score is down from six (6) only a few years ago.

No. 1). The community associations that represent the two communities most closely affected by the new bridge endorsed the high bridge design prior to 1985. (FAR, Appendix C at C–15, C–39; SAR at 42–44, 48–51, 53–54). The Anne Arundel Delegation to the House of Delegates also endorsed the high bridge design. (FAR, Appendix C at C–65). While this does not mean that the Plaintiffs participated in these endorsements, it does highlight the level of publicity and participation that accompanied the development process. As a result, the Plaintiffs, through diligence should have been informed of the commitment to a high bridge as early as 1985. By the Spring of 1990, when the design for the high bridge was selected and announced publicly, there should have been no doubt about what the Defendants intended to build. (FAR, Appendix D at 3; SAR at 576–81).

At what point a cause of action accrued during this process is a separate question. The Plaintiffs contend that no cause of action accrued until the federal funding was received. In support of this position they rely upon *Citizens Civic Ass'n v. Coleman*, 417 F.Supp. 975 (W.D.Wis.1976). Even assuming this is correct, the causes of action arose in December, 1990, when federal funds were appropriated. The delay from that time was explained at the hearing conducted in this case by the political efforts made by the Plaintiffs to stop construction.

The delay, even from December, 1990, has caused the Defendants considerable prejudice. We are now poised, quite literally, on the eve of the awarding of the construction contract. While the cases were filed in September, the intervening time was needed to provide an opportunity for the parties to brief the issues. Had the Plaintiffs not delayed in preparing these cases, and had filed when the funds were first appropriated, this litigation would not be occurring contemporaneously with the contracting process. As it now stands, any appeal will occur after the contract has been awarded and will likely only be heard following the initiation of construction. A delay at the contract stage or after is obviously far more expensive than a delay earlier in the process. Under such circumstances, the prejudice to the Defendants is substantial.

Accordingly, the Court finds that all of the Plaintiffs should be barred from pursuing this action because of laches and that the City of Annapolis should be estopped.

## IV. APPLICATION FOR PRELIMINARY INJUNCTION

To obtain injunctive relief, the Plaintiffs must satisfy the four part test enunciated in *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 196 (4th Cir.1977). These include: 1) likelihood of success on the merits; 2) irreparable injury to the plaintiffs if the injunction is not granted; 3) the injunctive relief will not injure the defendants and 4) the public interest favors the granting of the injunction. Based upon the previous discussion, the Plaintiffs have failed to satisfy the first and third prongs. While the Plaintiffs' interests will be adversely affected, the Court is persuaded that the public interests favor a prompt replacement of the existing bridge. The record is clear regarding the pressing need to retire the existing bridge. It has continued to deteriorate over the past eight years while the design for the proposed bridge was developed.

## V. CONCLUSION

For the reasons explained above, the Defendants' Motion for Summary Judgment will be granted and the Plaintiffs' applications for preliminary injunction denied. A separate order will be entered.