ALAMEDA WATER & SANITATION DISTRICT, Bear Creek Water & Sanitation District, The Consolidated Mutual Water Company, Platte Canyon Water & Sanitation District, Southwest Group (Bennett Bear Creek Farms Water & Sanitation District, Meadowbrook Water District, and Willowbrook Water & Sanitation District), and Southwest Metropolitan Water & Sanitation District, Plaintiffs,

v.

William K. REILLY, Administrator of the United States Environmental Protection Agency, the United States Environmental Protection Agency, Michael P.W. Stone, Secretary of the Army, and the United States Army Corps of Engineers, Defendants.

Civil Action No. 91–M–2047.

United States District Court, D. Colorado.

June 5, 1996.

Marcia M. Hughes, Lakewood, CO, for plaintiff.

Gary S. Guzy, Michael Zevenbergen, United States Department of Justice, Environmental Defense Section, Washington, DC, for defendant.

## MEMORANDUM OPINION AND ORDER

MATSCH, Chief Judge.

The plaintiffs are eight of forty-one municipal and quasi-municipal entities providing or distributing water to service areas in the four counties surrounding Denver, Colorado, that signed contracts with the Denver Water Board ("DWB" or "Denver") referred to as the Metropolitan Agreement in 1982 and the South Platte Agreement in 1984. In these inter-governmental contracts the suburban entities agreed to pay Denver eighty percent of all costs, including environmental permitting expenditures, associated with the development of a water project designed to meet the future water needs of the entire metropolitan area. The general objective was to create a master reservoir for the storage of water from natural flows and collection systems. These agreements sought to harmonize efforts to meet the demands of increased population and to replace competition with cooperation in the development of water resources. In April 1982, Denver signed a contract with the United States Army Corps of Engineers ("Corps") to conduct a System-wide Environmental Impact Statement ("EIS"). Between 1982 and 1988 approximately $40 million was spent on the Metropolitan Denver Water Supply EIS and related project development. The suburban share was $26,466,000.

After evaluation of many water supply sources and reservoir sites, a site known as Two Forks was selected for a dam and reservoir. That site is located on the South Platte River approximately one mile downstream from the confluence of the North Fork of the South Platte River with the South Platte River. It is approximately two miles upstream from Denver's Strontia Springs Dam.

The projected reservoir would provide long-term storage of natural flows from the North Fork of the South Platte River and the South Platte River. It would also store water from existing west slope collection systems which deliver water to the North Fork of the South Platte through the Roberts Tunnel. South Platte River flows and West Slope deliveries would be integrated with Denver's north system supplies through Gross Reservoir, increasing system flexibility.

Denver holds conditional water rights for the storage of 336,368 acre-feet of water from the South Platte River. Operation of a 1,100,000 acre-feet reservoir at the Two Forks site would increase the firm annual yield to the Denver system by 98,000 acre-feet per year, expected to be adequate to serve the anticipated demand in the metropolitan area for 33 years.

The parties to the South Platte Agreement expected that the projected construction at

the Two Forks' site would allow treatment of water at the Foothills Water Treatment Plant, distribution of the water largely through the complex infrastructure already in place and storage of their respective water rights in this large reservoir on the mainstem of the South Platte River.

Building a dam on a navigable river requires a permit from the Corps under the Federal Water Pollution Control Act, commonly known as the Clean Water Act ("CWA"), 86 Stat. 816, as amended, now codified in 33 U.S.C. § 1251(a). The application for a permit for the Two Forks dam was submitted on March 4, 1986. The application sought approval for placement of 1 million cubic yards of fill in the South Platte River to build a dam standing 615 feet high spanning a crest of 1,700 feet. The dam would create a reservoir with the storage capacity of 1.1 million acre-feet with a surface area of 7,300 acres, or 11.4 miles, flooding more than 30 miles of the river.

The proposal was evaluated extensively by state and federal governmental agencies with very active public participation in many hearings. Certain mitigations for the site were recommended by the Colorado Wildlife Commission and the U.S. Fish and Wildlife Service. The Colorado Water Quality Control Commission issued the state's certificate under Section 401 of the CWA on August 9, 1989, finding that no significant water quality impacts would be caused by Two Forks.

The EPA participated in the evaluation process and submitted comments to the Corps in response to its public notice of the availability of the draft environmental impact statement and the Section 404 permit application for the dam.

In March 1988, the Corps issued its Final Environmental Impact Statement ("FEIS"). On May 26, 1988, EPA submitted comments on the FEIS, indicating that Two Forks was the most environmentally damaging of the alternatives considered.

On March 15, 1989, the Corps filed a formal Notice of Intent to issue the permit for Two Forks. The Regional EPA Administrator was directed to inform the Corps that the EPA intended to initiate the process for a veto under subsection 404(c) of the CWA. The Regional Administrator removed himself from this process, apparently because of his public comments in support of it, and the EPA selected Lee DeHihns, the Deputy Regional Administrator for EPA Region IV, to conduct the regional phase of the Section 404(c) review. On August 29, 1989, Mr. De-Hihns issued a Proposed Determination to veto the Two Forks permit. The EPA published its Proposed Determination in the Federal Register on September 5, 1989.

On March 26, 1990, EPA Region VIII issued a Recommended Determination ("RD") on the Two Forks project, and sent it with the administrative record to EPA headquarters. The RD included a finding that Two Forks would inundate a "diverse riverine and wetland/upland complex with extremely high fisheries, wildlife and recreational values" and a conclusion that construction and operation of the dam would have unacceptable adverse effects on fishery, wildlife and recreation areas. An additional finding was that there were practicable, environmentally less damaging alternatives to Two Forks. Thus, the RD recommended that the Two Forks permit be vetoed.

The Applicants submitted a Corrective Action Proposal ("CAP") to the EPA on July 20, 1990. The CAP reduced the size of the reservoir at the Two Forks site to 450,000 acre-feet of storage, and dedicated 50,000 acre-feet to operation of a flow plan for purposes of fishery mitigation. The CAP attempted to avoid environmental impacts by changing mitigation to preserve Cheesman Canyon and modified the aquatic mitigation to 100%, in-kind mitigation in addition to significant reservoir mitigation. For example, the CAP avoided 35% of the impacts to recreation, the loss of 73 acres of wetlands as well as avoiding impacts to a portion of the known habitat of the Pawnee Montane skipper butterfly. The CAP also required that mitigation be successful before project construction would occur.

The EPA Assistant Administrator for Water issued a Final Determination ("FD") vetoing Two Forks on November 23, 1990. That decision prevented the Corps from issuing a proposed permit for construction of the

1.1 million acre-feet project. The FD also vetoed a 400,000 acre-feet version of Two Forks and the 450,000 acre-feet reservoir in the CAP proposed by the applicants.

The EPA based its decision on findings that any of these Two Forks projects would result in unacceptable adverse effects on fishery areas and recreational areas and that those losses were avoidable because there were less environmentally damaging practicable alternatives to Two Forks. Moreover, the EPA found that the resources which would be lost were so valuable that the project's impacts, even factoring in the proposed mitigation, were unacceptable.

EPA's FD concludes that each of the Two Forks projects "would inundate the South Platte corridor, which supports a vital aquatic ecosystem offering unmatched fishery and recreational values within a single location easily accessible to major metropolitan areas." The EPA found that the projects would have unacceptable adverse effects on aquatics and recreation, and that this damage was avoidable because alternatives to Two Forks existed. EPA also concluded that the adverse effects, even as mitigated, were too significant. One year after EPA issued the FD on Two Forks, plaintiffs filed this lawsuit against the EPA and the Corps challenging the veto under the Administrative Procedure Act.

## I. STANDING.

The defendants' initial response in this civil action was a motion to dismiss, challenging the standing of the plaintiff providers to bring this action. That motion was denied by this court's Memorandum Opinion and Order of October 2, 1992, based on a determination that the plaintiffs had adequately alleged that under the two agreements with Denver they had contract rights to compel Denver to build the Two Forks Dam if a permit could be obtained. The defendants now ask the court to again consider the redressability element of standing on the motion for summary judgment under Rule 56. The defendants argue that while general factual allegations suffice to defeat a motion to dismiss, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992), at this summary judgment stage the plaintiffs must show proof of specific facts to support their claims. The plaintiffs' reply on this issue includes an affidavit of Patrick J. Fitzgerald. In his affidavit, Mr. Fitzgerald identifies himself as district manager of two of the plaintiff districts and chairman of the "Metropolitan Water Providers" representing the suburban entities who are signatories to the Metro Agreement and the South Platte Agreement. Mr. Fitzgerald reaffirms a statement in a prior affidavit, filed in opposition to the motion to dismiss, that the plaintiffs can compel Denver to construct the project as described in the complaint and adds the following conclusion:

> Should the impediment presented by EPA's veto be removed as a result of the resolution of this case, and should Denver decide not to proceed with the construction of a dam at the Two Forks site, plaintiffs, in lieu of compelling such construction by Denver, could ultimately proceed, in conjunction with other participants, to construct a facility at the site upon the completion of mutually satisfactory agreements with Denver concerning water rights, real property rights, and financial compensation.

The plaintiffs have offered no evidentiary support for this speculation and the court must, accordingly, disregard it.

Upon review of the entire administrative record it is now apparent that construction of the dam and reservoir in any of the three suggested configurations depends upon participation by Denver. It is the holder of the Department of Interior right-of-way for a reservoir in the area, which it obtained in 1931, and it holds conditional water rights for more than 330,000 acre-feet of water on the South Platte. Denver has not joined this lawsuit and the plaintiffs have not submitted anything to indicate that Denver has any present interest in the project. Moreover, there is nothing to suggest that the thirty-three other providers who are signatories to these agreements have any willingness to proceed with the proposals that are the subject of the administrative action or any other alternatives. The plaintiffs do not have the

capacity to proceed on their own as Mr. Fitzgerald recognized in his affidavit, referring to proceeding "in conjunction with other participants." Those other participants have not been identified and nothing has been shown regarding the availability of the resources required for such a project.

Upon a review of the whole record, the necessary conclusion is that if the plaintiff providers prevailed in this case and obtained an order invalidating the EPA veto of the Two Forks Dam, with a remand to the EPA with directions to reconsider EPA's position, there will be no effective remedy. Even if the EPA reversed itself on reconsideration, there is nothing in this record to show that any dam would actually be constructed at Two Forks. Indeed, this controversy now appears to be only academic.

## II. *STANDARD OF REVIEW*

▆▆▆ Although the plaintiffs have failed to show standing and summary judgment may be granted on that basis alone, a review of the entire administrative record and a decision on the merits—advisory though it may be—is warranted because of the past public interest and the court's delay in deciding this case. The standard of review of the Section 404(c) veto under the Administrative Procedure Act, 5 U.S.C. § 706, is whether that decision was "arbitrary and capricious" or contrary to law. The agency's interpretation of the statute and applicable regulations are to be considered with an appropriate level of deference. *EPA v. National Crushed Stone Ass'n.,* 449 U.S. 64, 83, 101 S.Ct. 295, 306–07, 66 L.Ed.2d 268 (1980). The plaintiffs contend that the EPA has exceeded its authority under the CWA because the veto was based on recreational and fishery conditions not related to water quality changes caused by the proposed discharge of fill material into the river. They have cited extensive legislative history to suggest that in enacting the CWA Congress was concerned only with water *quality* impacts, such as pollution, and not effects relating to water *quantity* resulting from inundation.

The Supreme Court has decided to the contrary in *PUD No. 1 of Jefferson County and the City of Tacoma v. Washington Department of Ecology,* 511 U.S. 700, 114 S.Ct. 1900, 128 L.Ed.2d 716 (1994). Although the case before the Court was a state imposed minimum stream flow requirement for a state water quality permit, the interpretation of the CWA is instructive. In answering the petitioner's argument that the CWA was concerned only with water quality and not the regulation of water quantity, the Supreme Court said:

> In many cases, water quantity is closely related to water quality; a sufficient lowering of the water quantity in a body of water could destroy all of its designated uses, be it for drinking water quantity, recreation, navigation or as here, as a fishery.... This broad conception of pollution—one which expressly evinces Congress' concern with the physical and biological integrity of water—refutes petitioners' assertion that the Act draws a sharp distinction between the regulation of water quantity and water "quality."

*Id.* at —— —— ——, 114 S.Ct. at 1912–1913.

The Fourth Circuit Court of Appeals in *James City County v. EPA,* 12 F.3d 1330 (4th Cir.1993), *cert. denied* —— U.S. ——, 115 S.Ct. 87, 130 L.Ed.2d 39 (1994) reviewed the relationship between the Corps role in the permitting process, requiring consideration of the total range of factors bearing on the desirability of building a dam, including whether the project is in the public interest, and the EPA authority to veto based on its obligation to protect the environment. The conclusion was that the EPA authority to veto "is practically unadorned." *Id.* at 1336. While there is language in the opinion that suggests some support for the plaintiffs' emphasis on the quality of the water as the proper focus for the EPA involvement, the holding of the case is that the effects of inundation on the environment support a veto.

The damming of the South Platte River at the Two Forks site, in any of the three configurations proposed, would have enough impact on that water resource as to authorize the EPA to give careful consideration to the effects on recreational uses and aquatic life under Section 404(c) of the statute.

■ The plaintiffs have raised an additional legal issue by contending that the EPA improperly conducted the alternative analysis, required by the applicable guidelines, 40 C.F.R. § 230.10(a), by comparing the environmental impacts of alternatives without considering any mitigation, other than such mitigation as avoids those impacts. That approach was different from the analysis made by the Corps, which compared impacts of alternatives after reduction by likely mitigation. The defendants have supported the EPA decision by citing a 1990 memorandum of agreement between EPA and the Corps in which the Corps changed its position to agree with the EPA as support for the EPA's view. At any rate, the EPA's approach, known as "sequencing," is based on the agency's policy first to avoid impacts and then to mitigate those impacts which are unavoidable. That is a reasonable approach to the exercise of the agency's discretion in undertaking the alternative analysis. It is not legal error.

■ On the factual record, the plaintiffs take very strong exception to the finding by the EPA that the Estabrook and New Cheesman alternatives were practicable. That finding was also made by the Corps, based on the definition of project purpose made by the defendant agencies as the "provision of dependable long-term water supply to the metro Denver area." The plaintiffs dispute that generalization and point out that Denver submitted a detailed 10-point statement of purpose which considerably narrowed the range of possible sites. The EPA and the Corps were both required independently to review and define the project's overall purpose. They were not restricted to the definition contained in the application. Such broader statements were approved in analogous situations under other statutes in *Louisiana Wildlife Fed'n, Inc. v. York*, 761 F.2d 1044, 1047 (5th Cir.1985); *City of Angoon v. Hodel*, 803 F.2d 1016, 1021 (9th Cir.1986), *cert. denied* 484 U.S. 870, 108 S.Ct. 197, 98 L.Ed.2d 148 (1987) and *Trout Unlimited v. Morton*, 509 F.2d 1276, 1286 (9th Cir.1974).

■ The plaintiffs also challenge the findings by the EPA and the Corps that these alternatives were available and could be done. The guidelines do require that the practicable alternatives must be "available and capable of being done" considering cost, logistics and existing technology. 40 C.F.R. §§ 230.10(a)(2) and 230.3(q). The providers have shown that there are very substantial regulatory and legal obstacles to these alternatives, including the necessity for a transfer of water rights. Moreover, the New Cheesman project would require a Presidential exemption to build a tunnel through the Lost Creek Wilderness Area. The Estabrook alternative would require moving the Town of Bailey, including displacement of more than 200 residents from 81 homes and 62 seasonal dwellings and the closure of 37 businesses employing 140–250 people. Historic buildings would be inundated. These are, of course, serious obstacles, and it is doubtful that the necessary permits could be obtained after the required environmental studies.

The record shows that these impacts were considered by the EPA, resulting in a finding that the quantitative and qualitative impacts on aquatic life and recreation were much greater for the Two Forks projects and this court must be deferential to the expertise of the agency.

■ The defendants have also shown record support for the conclusion that even after mitigation the three proposals for the Two Forks Dam would result in significant and unacceptable adverse impacts. Essentially, the proposed mitigations placed emphasis on quantity rather than quality in substitutions of aquatic and recreational results. As an example, the applicants suggested conditions requiring replacement of 36,000 pounds of lost trout biomass with a replacement of 33,000 pounds of in-stream trout biomass and provision of an additional 200,000 pounds of reservoir trout biomass through a game fish stocking of the reservoir under a $10 million trust fund plan. The mitigation plan also showed an increase in recreational uses of the reservoir. However, the EPA decided that these quantity replacements were not an adequate substitute for the quality of the trout stream and white water recreation provided by the unobstructed river flow.

It is important in this regard to recognize the limitations on this court's authority in an APA review. The plaintiffs have made a strong case that their substitutions are adequate but they have not presented a sufficient showing to require a finding that the contrary analysis made by the EPA was arbitrary and capricious.

 The plaintiffs argue that the EPA veto violated the Wallop Amendment to the CWA, 33 U.S.C. § 1251(g), prohibiting interference with the state laws allocating quantities of water. They assert that prohibiting construction of these Two Forks projects adversely impacts the ability of Denver to make beneficial use of conditionally decreed water rights which could result in a determination that the rights have been abandoned. The obvious difficulty with this argument is that Denver is not making it. The plaintiffs do not have standing to protect Denver's water property rights. The contracts do not work an assignment of any interest in such rights to the plaintiffs. Moreover, the law requires only that an "accommodation" be made in the course of the permitting process. *Riverside Irrigation District v. Andrews,* 758 F.2d 508, 513 (10th Cir.1985). The veto was site and project specific. The EPA has done nothing to prevent Denver or any other water right owners to otherwise use their water rights or transfer them to other locations.

The plaintiffs have generally asserted a deprivation of due process, primarily based on the contention that this veto decision was made at the direction of a newly appointed EPA Administrator whose public statements showed a prejudice against a Two Forks dam and a prejudgment that controlled the outcome of the review process. The charge has not been proven in the papers filed. The regional administrator recused himself because of his own public statements and prejudgment in favor of the project. The plaintiffs have been unable to support their suspicion that the administrator dictated the final decision before the evaluation was made.

The massive administrative record submitted for review shows that, at bottom, the controversy surrounding the proposed Two Forks dam centered on a very difficult policy choice between assured water resources for continued urban development and preservation of a native environment. Any dam building—the replacement of a natural, free flowing reach of river with a manufactured lake—raises issues that divide public opinion along a fault line that cannot be bridged by compromise. The antagonists approach the question with divisive arguments loaded with emotional appeals to conflicting visions of the future. The public entities and agencies involved are responsive to different constituencies with divergent interests and values.

The role of the court is not to decide whether a dam should be built. It is simply to referee the record to determine the legality of the procedures by which the ultimate decision was reached by those with institutional authority to make public policy. The plaintiffs have presented a very powerful argument that the EPA has frustrated the will and efforts of local government in resolving a local problem by erecting a bureaucratic barrier to their project. They have not, however, proved that the EPA acted in excess of its statutory authority or made an arbitrary and capricious decision. That proof must be made to invoke the power of this court to vacate the EPA veto. Accordingly, it is

ORDERED that the defendants' motion for summary judgment is granted and this civil action is dismissed with prejudice.